## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **SAMUEL WILKIE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 23-00288-KD-M** |
| | ) | |
| **OUTOKUMPU STAINLESS USA, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>ORDER</u>

This action is before the Court on Defendant Outokumpu Stainless USA, LLC's

("OTK") Motion for Summary Judgment, (Doc. 34). Wilkie claims that OTK unlawfully

discriminated against him by failing to provide a reasonable accommodation for his disability,

by terminating him based on his alleged disability, and/or in retaliation for his Family Medical

Leave Act ("FMLA") request. OTK argues that Wilkie was terminated for lawful non-

discriminatory reasons and that Wilkie is unable to sustain his evidentiary burden to show

otherwise. Upon consideration and for the reasons set forth herein, OTK's Motion, (Doc. 34), is

**GRANTED**.[1]

---

[1] This action is also before the Court on Wilkie's Partial Motion to Strike, (Doc. 47). Wilkie moved to Strike portions of OTK's Reply Brief in Support of its Motion for Summary Judgment on the grounds that Wilkie believes three new arguments were raised in the Reply. While Wilkie is correct that new arguments presented for the first time in a reply brief are not properly raised, <u>Herring v. Secretary, Dep't of Corrections</u>, 397 F.3d 1338, 1342 (11th Cir. 2005) (citations omitted), that is not the case here. OTK does not raise new arguments in its Reply, but simply bolsters arguments previously raised or responds to an argument made by Wilkie in his Response in Opposition to the Motion for Summary Judgment. Both of which are proper in a reply brief. <u>See Tyson v. Dunn</u>, No. 3:17-CV-719-WKW, 2020 WL 2815120 at *4 (M.D. Ala. May 29, 2020); <u>WM Mobile Bay Env't Ctr., Inc. v. City of Mobile</u>, No. CV 18-0429-KD-MU, 2019 WL 5073658 at *1 (S.D. Ala. Feb. 8, 2019); <u>First Specialty Ins. Corp. v. 633 Partners, Ltd.</u>, 300 Fed. Appx. 777, 777-78 (11th Cir. 2008) (holding that evidence raised in the reply

I.    **Facts**

   A.  **Wilkie's Employment with Outokumpu Stainless USA, LCC**

   Outokumpu Stainless USA, LCC is a stainless-steel manufacturer that operates a location in Calvert, Alabama in Mobile County. Samuel Wilkie began working at OTK in 2012 and was employed there for nine years until his termination in December of 2021. Wilkie was promoted up to Shift Coordinator during his time at OTK from his starting position of crane operator. At the time of his termination, he held the Shift Coordinator position in the Finishing Department. This position required a rotating shift schedule and the supervision of his team, comprised of approximately 15 operators. Wilkie's direct supervisors were Finishing Coordinator Sean Rowser ("Rowser") and Finishing Manager Wendell Bedwell ("Bedwell"). Wilkie's other superiors were Vice President of Operations Tony Harris ("Harris") and Senior Vice President of Operations Joachim Stolz ("Stolz"). David Scheid ("Scheid") was Vice President of Human Resources, and Marva Rodrigues ("Rodrigues") was a Human Resource business partner, and was supervised by Scheid.

   B.  **Wilkie's medical conditions**

   Throughout Wilkie's employment with OTK he has suffered from various physical limitations due to his nine-year service in the Marine Corps. (Doc. 32-2 at 4, 15 (Plf. Dep. at p. 18-19; 77-78)). Specifically, Wilkie has a lumbar spinal condition, PTSD, sciatica on both sides of his body, and tendonitis. (Doc. 1 at 3 ¶ 14) See also (Doc. 32-2 at 15-16 (Plf. Dep. at p. 77, 81)). Wilkie's superiors were aware of his conditions as he regularly attended appointments for

---

brief to rebut arguments made in the opposition to the motion for summary judgment was not new evidence). Accordingly, Wilkie's Motion, (Doc. 47), is **DENIED.**

them, his struggles were visible to those around him, and OTK provided him accommodations as necessary. (Doc. 32-2 at 9 (Plf. Dep. at p. 50-51)) See also (Doc. 1 at 4 ¶ 17). For example, years before this action, Wilkie became unable to operate a crane or heavy machinery due to some of his prescribed medications and OTK allowed him to avoid those tasks. (Doc. 32-2 at 9 (Plf. Dep. at p. 50-51)).

### 1. Reasonable Accommodation Requests

Wilkie alleges that the rotating shift schedule of a Shift Coordinator weighed on him to the point he developed insomnia. (Doc. 1 at ¶ 18). Wilkie sought treatment from the Department of Veteran's Affairs ("VA") for his insomnia.[2] (Doc. 32-2 at 16 (Plf. Dep. at p. 81-84)) See also (Doc. 32-10). The nurse practitioner at the VA informed Wilkie at one of his appointments that he would have to regularly take the medicine for insomnia for it to be effective. (Doc. 32-2 at 16 (Plf.'s Dep. at p. 83)). On October 5, 2021, the nurse practitioner then wrote a note[3] including this information and a recommendation that Wilkie be given an accommodation to work only the day shift. (Doc. 32-10). On October 6, 2021, Wilkie provided this note to Human Resources business partner Rodrigues as proof he needed to work only the day shift. (Id); (Doc. 32-2 at 16 (Plf. Dep. at p. 84)). This was not an accommodation that OTK could make for a Shift Coordinator since the Shift Coordinator must be available for the different shifts worked by his

---

[2] Previously, Wilkie had received treatment from the VA for his disabilities that resulted from his service in the Marines. (Doc. 32-2 at 15-16 (Plf. Dep. at p. 77, 83-84)). He first applied for medical benefits and treatment in 2018 and received them beginning in 2019. Id.

[3] The note from the VA nurse practitioner read: "The above-referenced patient [Wilkie] is under my care. His diagnosis is exacerbated by insomnia due to changes in his work shift. I would like to recommend that Mr. Wilkie be scheduled for daytime work exclusively due to this. Thank you for your consideration of my recommendation." (Doc. 32-10).

crew. (Id. at 10, 13, 16 (Plf. Dep. at p. 53-54, 65, 83)). Wilkie acknowledged this would not be a feasible accommodation for him to receive. (Id. at 13, 16 (Plf. Dep. at p. 65, 83)).

Instead, Rodrigues talked with Wilkie about other accommodations. (Doc. 42-6 at 21 (Rodrigues Dep. at p. 96)). Rodrigues stated that she provided Wilkie with Americans with Disabilities ("ADA") paperwork to complete and bring back to her no later than October 20th. (Doc. 32-7 at 3 (Rodrigues Dep. at p. 104); (Doc. 32-12). Wilkie does not recall receiving this paperwork. (Doc. 42-1 at 18 (Plf. Dep. at p. 88)). This paperwork included a request for medical documentation and a reasonable accommodation questionnaire that needed to be completed by Wilkie's healthcare provider at the VA. (Doc. 32-12 at 6-13); (Doc. 42-1 at p. 117-22). The purpose of the paperwork is to give OTK a better understanding of the situation and allow OTK to hopefully accommodate Wilkie. (Doc. 32-2 at 16 (Plf. Dep. at p. 84)); (Doc. 32-12 at 1); (Doc. 42-6 at 20-25 (Rodrigues Dep.at p. 95-96, 99-102)). OTK's interactive process is the mechanism used by OTK to determine a reasonable accommodation. (Doc. 32-6 at 2); (Doc. 42-6 at 135).

Prior to requesting an accommodation, Wilkie had applied to two positions – Safety Specialist and Manager – in part due to the insomnia and in part to open more leadership opportunities for himself. (Doc. 32-2 at 14, 18 (Plf. Dep. at p. 74, 90)); (Doc. 32-11).  Wilkie told Rodrigues about these applications and Rodrigues told Wilkie to continue to apply to these positions. (Doc. 32-2 at 18 (Plf. Dep. at p. 90-91)). Rodrigues also told Wilkie that once she received the necessary paperwork from Wilkie, she would keep an eye out for positions to which Wilkie could apply. (Doc. 32-7 at 7 (Rodrigues Dep. at p. 136-37)); (Doc. 42-6 at 20-21 (Rodrigues Dep. at 95-96)). After this conversation, Wilkie applied to one more position – Sales Support Planning. (Doc. 32-2 at 20 (Plf. Dep. at p. 100)). Wilkie was not hired for any of the

positions for which he applied. (Doc. 32-13 at 1-2). OTK contends he was not the most qualified for any of these positions. (Id.)

After Wilkie failed to return the needed accommodation paperwork by the October 20th deadline, Rodrigues reached out to Wilkie and requested it once again. (Doc. 32-7 at 9 (Rodrigues Dep. at p. 143-44)); (Doc. 42-6 at 48-49 (Rodrigues Dep. at p. 143-44)). However, Wilkie told Rodrigues that he was having a difficult time getting the VA to complete the paperwork because his VA evaluation status would change. (Id. at 9-10, 12 (Rodrigues Dep. at p. 143-148, 154)); (Doc. 42-6 at 49, 54-55 (Rodrigues Dep. at 144, 153-54)). Rodrigues never received the accommodation paperwork or any other information from Wilkie's medical provider explaining his need for an accommodation. (Id. at 11 (Rodrigues Dep. at p. 150-52)); (Doc. 42-6 at 52-53 (Rodrigues Dep. at p. 151-52)). Thus, Wilkie's status on the interactive process for his request for a reasonable accommodation was still "open" at the time of his termination. (Id. at 10 (Rodrigues Dep. at p. 148)).

### 2. Wilkie's Family Medical Leave Act ("FMLA") Request

Wilkie also consulted Rodrigues about future FMLA leave. Specifically, Wilkie told her that he had three upcoming surgeries, and that one for his back injuries would likely make him eligible for and give him need to take leave under the FMLA. (Doc. 32-2 at 16-17 (Plf. Dep. at p. 84-87)); (Doc. 42-1 at 15-17 (Plf. Dep. at p. 84, 86-87)). Wilkie did not know when this leave would take place since his surgery date had not been set. (Id.). Wilkie previously took two different FMLA leaves for back surgeries in 2015 and 2018 respectively. (Doc. 32-2 at 6-7 (Plf. Dep. at p. 38, 41)). To take FMLA leave, an employee must adhere to the guidelines presented by OTK and the Department of Labor Regulations which include the requirement of the intended timeframe for that leave. (Doc. 32-6 at 4); 29 C.F.R. §825.302(c). Rodrigues requested

5

Wilkie return with the completed FMLA paperwork when he determined the approximate timeline for his surgery.[4] (Doc. 32-2 at 17 (Plf. Dep. at p. 87)); <u>See also</u> (Doc. 32-7 at 7-8 (Rodrigues Dep. at p. 137-38)); (Doc. 42-6 at 46-47 (Rodrigues Dep. at p. 137-38)). Wilkie never returned any paperwork or documentation prior to his termination. (Doc. 42-6 at 46-47, 52 (Rodrigues Dep. at p. 137-38, 151-52)).

### C. Wilkie's Termination

According to OTK, Wilkie was terminated for failing to abide by OTK's Standard Operating Procedures ("SOP") for Shift Coordinators and for providing First Aid after being warned not to do so. (Doc. 42-7 at 101-102, 105, 109-10 (Rodrigues Dep. at p. 238-39, 242, 255-56)). Specifically, OTK alleges that Wilkie failed to follow policy HSS-12 as the SOP that governs in the event that someone gets injured on the job. (Doc. 32-20). HSS-12 is a step-by-step instruction to be followed by a person injured, witnesses to the incident and the Shift Coordinator on site. (Doc. 32-20). A FIN Help Chain chart is provided to aid OTK finishing department employees in understanding the reporting duties under the SOP. (Doc. 32-21); (Doc. 32-18 at 10 (Bedwell Dep. at p. 76-77)).  In addition to these procedures, OTK also contracts with fire and medical first responders to work at their Calvert location to respond to incidents that may occur during work. (Doc. 32-2 at 23 (Plf. Dep. at p. 115-16)). Typically, when someone is injured, the Shift Coordinator is notified, and then the Shift Coordinator assesses the situation and calls the on-site Fire and Rescue team. (Doc. 32-21); (Doc. 42-1 at 40 (Plf. Dep. at p. 115)). However, Safety Specialist Keith Stewart testified that Shift Coordinators are not to provide treatment to the injured. (Doc. 32-17 at 11 (Stewart Dep. at p. 77)).

---

[4] This back surgery did not take place until June 2022. (Doc. 1 at 4-5 ¶ 22; Doc. 32-2 at 42 (Plf. Dep. at p. 225)).

On October 22, 2021, Wilkie was on his shift when his team member, Henderson Walker ("Walker") injured his elbow while working to fit a coil of stainless steel onto a coil wrapper. (Doc. 32-22 at 1). When alerted of the injury, Wilkie contacted Fire & Rescue as the procedures require, but then went a step further and provided first aid to Walker. (Doc. 32-22 at 10); (Doc. 42-1 at 61-62 (Plf. Dep. at p. 145-46)). Bedwell spoke to Wilke and alerted him that his actions were not proper protocol and reminded him of the proper procedure following an injury. (Doc. 32-2 at 27 (Plf. Dep. at p. 145-46)); (Doc. 32-18 at 3-4 (Bedwell Dep. at p. 33-34)). Bedwell testified that Wilkie believed that he was properly trained to administer first aid to Walker because of his training with the military. (Doc. 32-18 at 4 (Bedwell Dep. at p. 34)). However, Bedwell disagreed and specifically instructed Wilkie that this was not OTK protocol. (Id., at 35-36). Moreover, after this incident, Bedwell and other superiors within OTK called a team meeting to remind all employees, including all Shift Coordinators, of the SOP Incident Procedures. (Id. at 4-5 (Bedwell Dep. at 37-39)). The OTK superiors also printed incident reporting cards for all Shift Coordinators. (Doc. 32-18 at 5). The cards contained a shortened version of the SOP for when an incident arises. (Doc. 32-25, Incident Reporting Card) at 33 (Plf. Dep. at p. 181-82)); (Doc. 32-19 at 7 (Rowser Dep. at p. 109-11)).

On December 11, 2021, another member of Wilkie's team – Harley Woods ("Woods") – complained to Trent Wiley (the First Operator and direct employee under Wilkie) of an itching and burning sensation on her neck. (Doc. 32-4 at 2 (Wiley Dep. at p. 19-21)); (Doc. 42-3 at 8-10 (Wiley Dep. at p. 23-25)).  Wiley instructed Woods to report to Wilkie ((Doc. 42-3 at 10 (Wiley Dep. at p. 25)).  Woods informed Wilkie of the rash about an hour after it appeared and Wilkie instructed her to go to Fire & Rescue, but Woods refused. (Doc. 42-1 at 43, 74-76 (Plf. Dep. at p. 158-160)); (Doc. 32-18 at 16 (Bedwell Dep. at p. 138-39)).  At Woods' request, Wilkie told

Woods she could get an ointment from the First Aid kit to place on the rash, which she did. (Doc. 42-1 at 56-57 (Plf. Depo. at p. 137-138)). Wilkie also gave her an icepack. (Doc. 42-1 at 56, 76 (Plf. Dep. at p. 137, 160)). Woods then informed Wilkie that the rash felt better. (Doc. 42-1 at 57 (Plf. Dep. at p. 138).

About an hour later, and after Wilkie had left work, Woods called Wilkie and told him she was going to the emergency room (Doc. 42-1 at 76 (Plf. Dep. at p. 160). Wilkie contacted Stewart, the "Safety on Call" and then called Rowser to notify him that he had contacted Stewart (Id.). Once Wilkie informed Rowser, Rowser did not communicate with Bedwell about the incident.[5] (Doc. 32-18 at 20 (Bedwell Dep. at p. 162-63)).

Wilkie filled out an incident report the day it occurred, and Bedwell then sent Wilkie home for three days as OTK investigated the incident. (Doc. 32-26) (Doc. 32-28 at 4). After the close of the investigation, Rodrigues and Bedwell called Wilkie and informed him of his termination. (Doc. 32-7 at 18 (Rodrigues Dep. at p. 255-56)); (Doc. 42-1 at 84-85 (Plf. Dep. at p. 175-76)). Ultimately the decision was upheld by Scheid. (Doc. 32-1 at 9 (Scheid Dep. at p. 98-99)).

In another department, on December 15, 2021, Charles "Chuck" Parker ("Parker") was fired for violating the same policies under the SOP as Wilkie. (Doc. 32-32); (Doc. 32-2 at 35-36 (Plf. Dep. at p. 200-01)). Specifically, Parker, a Shift Coordinator, administered First Aid (eyedrops) to an employee and failed to report the incident. (Doc. 32-2 at 35-36 (Plf. Dep. at p. 200-01)); (Doc. 42-5 at 54-57 (Stewart Dep. at p. 106-09)).

## II.    <u>Standard of review</u>

---

[5] Rowser was not at work that day and on Monday after giving his statement on the incident was sent home pending investigation. (Doc. 32-26). After the investigation, OTK determined Rowser did not violate the SOP. (Doc. 32-7 at 15-16 (Rodrigues Dep. at p. 241, 243-44)).

Summary judgment is granted when "the movant shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is considered material when it has the ability to alter the outcome of the case. <u>Zaben v. Air Products & Chemicals, Inc.</u>, 129 F.3d 1453, 1455 (11th Cir. 1997) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)). A genuine dispute of material fact exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Anderson.</u>, 477 U.S. at 248.

Summary judgment functions as a means to "isolate and dispose of" claims or defenses that are not adequately supported by the facts. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986). One "'purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting Advisory Committee Note to 1963 Amendment of Fed. Rule. Civ. Proc. 56(e)).

A genuine issue for trial is nonexistent when a reasonable jury would not be able to find for the nonmoving party based on the facts. <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 587 (citing <u>First Nat. Bank of Arizona v. Cities Service Co.</u>, 391 U.S. 253, 289 (1968)). Although the facts are viewed in the most favorable light to the nonmoving party, the nonmoving party bears the burden of designating specific facts to show that a genuine issue to be solved at trial exists. <u>Id</u>. The nonmoving party must establish more than doubt regarding the material facts to proceed to trial. <u>Id</u>. (citations omitted). Merely an alleged factual dispute will likewise be insufficient to establish a genuine issue of material fact. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

Therefore, when the moving party meets their burden and the nonmoving party does not convincingly show a dispute of the facts, the motion for summary judgment shall be granted. Fed. R. Civ. P. 56(a). A motion for summary judgment is properly granted when the "pleadings, depositions, answers to interrogatories, and admissions on file" are considered and relied upon in the decision. Celotex Corp., 477 U.S. at 324.

### III.    Argument

#### A.    Count I – Discrimination in Violation of the Americans with Disabilities Act

The Americans with Disabilities Act ("ADA") was established to prevent discrimination against disabled individuals in everyday activities, including the workplace. 42 U.S.C. §12101(a)(3), (b)(1)-(2). The ADA prohibits employers from discriminating against qualified individuals suffering from a disability due to their disability in the terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a); United States Equal Employment Opportunity Comm'n v. St. Joseph's Hosp., Inc., 842 F.3d 1333, 1343 (11th Cir. 2016); Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001).

#### 1.    Request for Reasonable Accommodation

Wilkie alleges that he was discriminated against because OTK failed to provide him a reasonable accommodation. However, as set out supra, Wilkie failed to follow through on his request for an accommodation. Usually when an employee requests a reasonable accommodation, the employer must then engage with the employee in an interactive process to find the best accommodation. 29 C.F.R. § 1630.2 (o)(3). Wilkie points to the Eleventh Circuit Court of Appeals' holding that an employee only needs to identify their disability and how a particular accommodation would benefit them to begin the interactive process. Owens v. Governor's Off. of Student Achievement, 52 F.4th 1327 (11th Cir. 2022), cert. denied sub nom.

Owens v. Georgia Governor's Off. of Student Achievement, 143 S. Ct. 2465 (2023). However, Wilkie has failed to present evidence that he provided OTK with this basic information. Like Owens, Wilkie failed to provide essential details about the nature and duration of his alleged disability. The only information OTK had from a medical provider was the note from a nurse practitioner that said that an undisclosed diagnosis is exacerbated by insomnia. In sum, OTK's request for information was consistent with its need to "identify the precise limitations resulting from the disability and potential reasonable accommodation." 29 C.F.R. 1630.2(o)(3). And Wilkie's failure to provide the information is fatal to his claim.

Moreover, even if Wilkie had returned the requested documentation, Wilkie failed to identify a reasonable accommodation that would allow him to perform the essential functions of his job as a Shift Coordinator. A qualified individual is defined by the ADA as a person who can carry out the necessary elements of the position in which they are employed or desire to be employed with or without a reasonable accommodation. 42 U.S.C. §12111(8). Essential functions of a job are determined by the employer's written description of the job or the employer's judgment. Id. A function of a position may also be considered essential based on: "(1) the amount of time spent on the job performing the function, (2) the consequences of not requiring the incumbent to perform the function, (3) the terms of the collective bargaining agreement, (4) the work experience of past incumbents in the job, and (5) the current work experience of incumbents in similar jobs." Davis v. Florida Power & Light Co., 205 F.3d 1301, 1305 (11th Cir. 2000) (citing 29 C.F.R. §1630.2(n)(3)). In D'Angelo v. ConAgra Foods, Inc., 11th Circuit used the testimony of the plaintiff in their reasoning of whether a function was

considered essential under these factors.[6] 422 F.3d 1220, 1230, 1232-34 (11th Cir. 2005). If an individual cannot meet the requirements to be a qualified individual, then their claim under the ADA must fail.

Wilkie's complaint alleges that he is a qualified individual because despite his disability, he could perform the essential function of his position of Shift Coordinator with or without a reasonable accommodation. (Doc. 1 at ¶ 67-69). A reasonable accommodation is defined as a "modification[] or adjustment[] to the work environment…that enable[s] an individual with a disability who is qualified to perform the essential functions of that position[.]" 29 C.F.R. § 1630.2(*o*)(1)(ii). The ADA requires an employer to modify job requirements to help a disabled individual if the requirement is marginal to the job as a whole. Holly v. Clairson Indus., L.L.C., 492 F.3d 1247,1256 (11th Cir. 2007).

The ability to work a rotating shift is a physical requirement of the Shift Coordinator position listed on the job description from OTK. (Doc. 32-5 at 5). Wilkie also testified that Shift Coordinators work on a rotating shift that rotates from day shift to night shift every two weeks making it a constant function of the job. (Doc. 32-2 at 10 (Plf.'s Dep. at p. 53). Wilkie stated that he knew no Shift Coordinators that worked only day shift as Shift Coordinators rotated shifts to stay as a cohesive unit with their team.[7] (Doc. 32-2 at 11 (Plf.'s Dep. at p. 57). Accordingly, there is no dispute that shift rotation is an essential function of being a Shift

---

[6] "The next factor—the amount of time D'Angelo spent working on a conveyor belt during her tenure as a product transporter—further raises a genuine issue of material fact. D'Angelo's description of her experience working as a product transporter indicates that working on a conveyor belt was at most an occasional function of her job." D'Angelo, 422 F.3d at 1232.

[7] "Q: Okay. But the shift coordinators – I mean no shift coordinator works consistently on days? A: Correct, ma'am." (Doc. 32-2 at 11 (Plf.'s Dep. at p. 57)).

Coordinator.[8] D'Angelo, 422 F.3d at 1230-34; 29. C.F.R. §1630(n)(3). Therefore, Wilkie's requested accommodation of day shift as a Shift Coordinator is unreasonable because it undermines an essential element of the job barring him from being considered a qualified individual.

Wilkie also argues that OTK should have accommodated him by placing him in a vacant day shift position. For an employer to be required to consider reassignment as an accommodation for an employee, the employee must request reassignment and provide proof that there is a vacant position which they would be able to perform. Frazier-White v. Gee, 818 F.3d 1249, 1256 (11th Cir. 2016).

Even if Wilkie's applications to the three open positions were construed as a specific accommodation request of reassignment and Wilkie had properly submitted the paperwork required, OTK was not required to reassign Wilkie if he was not the most qualified applicant. St. Joseph's Hospital, 842 F.3d at 1346.[9] A company is not required to disregard their standard hiring practice to accommodate an employee's request for reassignment. Id. However, Wilkie contends that OTK did not follow their best qualified candidate hiring policy when accommodating individuals under the ADA according to testimony by Scheid and Rodrigues. (Doc. 41 at 17). In reply, OTK points to its Recruitment/ Onboarding policy Wilkie submitted into evidence that states OTK is "committed to employing the best qualified candidates…"

---

[8] Factors 3 and 4 are inapplicable to this analysis as there is no evidence from the parties to support either factor.

[9] "In concluding that the ADA only requires an employer allow a disabled person to compete equally with the rest of the world for a vacant position, this Court is cognizant that 'the intent of the ADA is that an employer needs only to provide meaningful *equal* employment opportunities'..." St. Joseph's Hospital, 842 F.3d at 1346 (quoting Terrell v. USAir, 132 F.3d 621, 627 (11th Cir. 1998)).

(Doc. 45 at 5). OTK also suggests that the testimony by Scheid and Rodrigues, with which Wilkie supported the idea that to accommodate an individual they did not need to be the most qualified candidate, was based on vague hypothetical questions. (Id.).

Even though OTK disputes whether Wilkie was qualified for the position, Wilkie does not argue that he was the most qualified candidate for any of the positions. Further, Wilkie agrees that he should not have been hired in a position over someone more qualified.[10] (Doc. 32-2 at 19 (Plf. Dep. at p. 96)). OTK did not have the duty to reassign Wilkie to a position when there was a better applicant. St. Joseph's Hospital, 842 D. 3d at 1346. As the 11th Circuit stated in St. Joseph's Hospital: "the ADA was never intended to turn nondiscrimination into discrimination against the non-disabled." Id. (citing Terrell v. USAir, 132 F.3d 621, 627 (11th Cir. 1998)) (internal quotations omitted).

## 2. ADA Discrimination[11]

Wilkie asserts that his termination was because he was disabled. In order to establish a prima facie case under the ADA for employment discrimination, an employee must prove (1) their disability, (2) they are a qualified individual, and (3) they were unlawfully discriminated against because of their disability. Morisky v. Broward Cnty., 80 F.3d 445, 447 (11th Cir. 1996) (citation omitted). There are two ways for a plaintiff to establish a prima facie case of employment discrimination with circumstantial evidence under the ADA – the McDonnell Douglas burden shifting analysis and the convincing mosaic framework. Akridge v. Alfa Ins.

---

[10] "Q. The most qualified person is who should be hired for the position? A. Correct." (Doc. 32-2 at 19 (Plf. Dep. at p. 96)).

[11] In his complaint, Wilkie cites to the retaliation provision of the ADA. However, he failed to plead a separate claim of ADA retaliation and has failed to correct any misconstruction of his claim as an ADA discrimination claim.

Companies, 93 F.4th 1181, 1191, 1197 (11th Cir. 2024). The McDonnell Douglas burden-shifting analysis requires Wilkie to prove his prima facie case, then the burden shifts to OTK to provide a true and nondiscriminatory reason for the termination, and then shifts back to Wilkie to prove there is a pretextual reason for the termination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973). In Wilkie's prima facie case, OTK does not dispute that Wilkie has a disability, although it is not clear what that disability was.

As to whether Wilkie is a "qualified individual." OTK argues that Wilkie cannot show he was a qualified individual to perform the Shift Coordinator job because the requested accommodation of day shift only would eliminate an essential function of the job, i.e. to be available for the different shifts worked by your team. Despite Wilkie's attempt to backtrack, Wilkie admits this to be an essential function of the job.

However, Wilkie argues that he is still a qualified individual because he was qualified for other jobs that were available at OTK. Citing to Smith v. Midland Brake, Inc., a Div. of Echlin, Inc., 180 F.3d 1154, 1162-63 (10th Cir. 1999), Wilkie argues that because his disability would not disqualify him from other positions, he meets the definition of qualified individual. (Doc. 41 at 34). OTK does not respond to this authority or argument. The Court will assume the correctness of Wilkie's argument and proceed to the final prong. [12]

### a.  "But For" Causation

The third prong Wilkie must prove is that his disability was the "but for" cause of his termination. Akridge, 93 F.4th at 1192. In order to prove a "but for" causation of the

---

[12] The Court notes that rejection of the reasonable accommodation claim makes this argument specious. It appears to the Court that the ADA claim is better postured as a retaliation claim, i.e. terminated in retaliation for requesting an accommodation. But since that is not the parties' argument the Court will evaluate the claim as argued. But even if this was the claim, Wilkie has still failed to rebut as pretext the legitimate lawful reason for termination.

termination, Wilkie must present a similarly situated, non-disabled comparator. Id. at 1194-95 (citations omitted). The similarly situated, non-disabled comparator must share similarities with the plaintiff such as the basic misconduct, be under the same employment policies and supervisors, and have a similar employment or discipline history. Lewis v. City of Union City, 918 F.3d 1213, 1228 (11th Cir. 2019). To establish a presumption of discrimination, the comparator must have been treated differently for the same conduct. Oirya v. Auburn Univ., 2019 WL 4876705 at *17 (M.D. Ala. Oct. 2, 2019), aff'd, 831 F. App'x 462 (11th Cir. 2020).

When arguing that the comparators are not adequate, OTK relies heavily on the fact that Wilkie was previously counseled for violating OTK's safety policy. Wilkie contends that because he was not disciplined for the prior incident involving an alleged SOP violation, the incident should not be considered when determining comparators. This argument is given without any supporting authority in the law. Perhaps this is because it is meritless. The fact that Wilkie had been previously counseled against engaging in similar behavior, i.e. providing first aid to an injured employee, is certainly relevant to whether he was treated similarly to other employees on this occasion. And Wilkie's assertion that he did not actually apply the First Aid to Woods is a difference without distinction.

Wilkie provides five names as comparators. However, none of these individuals is an adequate comparator.

First, Wilkie summarily asserts that Wiley violated the SOP but yet was not terminated. However, the evidence is that Wiley sent Woods to Wilkie - her Shift Coordinator - when Woods reported the rash to him. Further, no evidence exists that Wiley previously was counseled for violating OTK's safety policy.

Wilkie also alleges that the Court should look to Bedwell as a comparator. Wilkie argues that Bedwell had an obligation to report Wilkie's back injury every time he saw Wilkie struggling. However, other than making this assertion, Wilkie fails to point to any specific incident that would have been a reportable incident. Therefore, Bedwell is not an adequate comparator.

Wilkie also makes an unsupported and unexplained claim that Woods should have been terminated since she did not report the incident through the SOP. The Court will not make Wilkie's argument. However, the Court notes that Woods reported the rash to her supervisor and to Wilkie. There is no evidence that Woods violated the SOP as it pertained to a line employee or that she had been previously warned that similar behavior was violative of the SOP. Woods is not a comparator.

Wilkie also alleges that Steven Harris, a line employee, violated the SOP and is therefore a comparator. This assertion stems from the fact that Woods told Harris about the rash before reporting it to Wiley. Harris was a team member not a leader or supervisor. Wilkie fails to explain how Harris violated the SOP. Harris is not a comparator.

The closest comparator offered by Wilkie is Rowser, as he was also investigated and sent home for failing to report the incident. (Doc. 32-26). Rowser was Wilkie's direct supervisor in the Finishing Department and was out of work the day of the Woods incident. Under the Help Chain it appears Rowser was required to contact Bedwell about the Woods incident but failed to do so. (Doc. 32-18 at 20 (Bedwell Dep. at p. 162-63)). However, it was determined after the investigation that Rowser did not violate the SOP and would not be disciplined. (Doc. 42-6 at 104-05 (Rodrigues Dep. at p. 241-42)); (Doc. 32-18 at 20 (Bedwell Dep. at p. 163-65)). Further, there is no evidence that Rowser previously violated the SOP or had been counseled for not

following proper OTK safety protocol. Therefore, each comparator Wilkie presented as evidence of "but for" causation fails to prove the final element of prima facie case of discrimination.

### b.  Convincing Mosaic Framework

Wilkie can also survive summary judgment by presenting circumstantial evidence of a convincing mosaic from which it can be inferred that the defendant acted to intentionally discriminate against them. <u>Lewis</u>, at 1220 (11th Cir. 2019). In order to show the convincing mosaic, Wilkie must prove "among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred; (2) systemically better treatment of similarly situated workers; and (3) pretext. <u>Id.</u>  Non-strict comparators can be used to paint a plaintiff's convincing mosaic. <u>Akridge</u>, 93 F.4th at 1198.

In an effort to show pretext, Wilkie expends a great deal of time quibbling with OTK's interpretation of the SOP. By this argument, Wilkie misses the mark. The issue is not whether OTK's interpretation of the SOP is correct. OTK is free to require more or less than is included in the written policy. Wilkie has no "right" to have the SOP policy applied as written or even how the SOP should reasonably be interpreted. Both parties have followed this red herring.

The issue is whether there is sufficient evidence for a jury to find that Wilkie was terminated because he was disabled. The application of the SOP is only relevant to show that it was used as pretext for terminating Wilkie when the underlying reason was really ADA discrimination.

To establish a pretextual reason for a termination exists, the reason must be shown to be false *and* that discrimination was the real reason. <u>Akridge</u>, 93 F.4th at 1196 (quotation omitted). The burden to prove this is on the plaintiff and must be proved by significant probative evidence

to avoid summary judgment. <u>Mayfield v. Patterson Pump Co.</u>, 101 F.3d 1371, 1376 (11th Cir. 1996). "This evidence must reveal such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." <u>Owens</u>, 52 F.4th at 1338 (quoting <u>Jackson v. Ala. State Tenure Comm'n</u>, 405 F.3d 1276, 1289 (11th Cir. 2005)) (internal quotations omitted). "Conclusory allegations of discrimination, without more, are not sufficient to raise an interference of pretext or intentional discrimination where [an employer] has offered … extensive evidence of legitimate, non-discriminatory reasons for its actions." <u>Mayfield</u>, 101 F.3d at 1376 (quoting <u>Isenbergh v. Knight-Ridder Newspaper Sales, Inc.</u>, 97 F.3d 436, 443-44 (11th Cir. 1996)). When the employer has provided a legitimate, reasonable reason for the action, the plaintiff must then meet it head on and rebut it for an employer can terminate an employee for any reason and based on knowledge that may be erroneous as long as the reason is not discriminatory. <u>Chapman v. AI Transp.</u>, 229 F.3d 1012, 1030 (11th Cir. 2000) (citations omitted). The 11th Circuit has repeatedly stated its position is not to second guess the validity of an employer's reasoning as courts "do not sit as a super-personnel department that reexamines an entity's business decisions." <u>Id.</u> (quoting <u>Elrod v. Sears, Roebuck & Co.</u>, 939 F.2d 1466, 1470 (11th Cir. 1991) (internal quotations omitted). Additionally, the pretext analysis is not hinged upon the employee's beliefs, but the employer's beliefs and the reality that exists within the employer's head. <u>Alvarez v. Royal Atl. Devs., Inc.</u>, 610 F.3d 1253, 1266 (11th Cir. 2010).

       As stated, OTK's proffered nondiscriminatory reason for Wilkie's termination is that he violated OTK's safety protocol on two separate occasions. Moreover, the second occasion came after a conversation with Wilkie personally about following the SOP in the future. In response, Wilkie presents 13 reasons that OTK's proffered reasons are pretextual:

"(1) genuine issues of disputed material fact exist as to whether or not the SOP and FIN Help Chain even applied to the nonemergency situation with Express contractor Woods; (2) the lack of any documented SOP processes in relation to the Woods event show that it was not an incident sufficient to trigger the SOP and notification processes: (3) OTK utilizes a Green Card process for nonemergency incidents which do not rise to the level of triggering the SOP and notification processes, undercutting the "everything has to be reported" contention; (4) how and when the SOP and reporting policies apply is a highly disputed factual matter among all the OTK witnesses with many contradicting themselves; (5) whether Wilkie had the authority to act with discretion under the clear language of the SOP in relation to Woods and Walker is disputed and evidence shows he took a "wait and see" approach as used and approved by Bedwell; (6) multiple members of supervision involved in the matter could not definitively say whether or not Wilkie's actions were violations of the policies or not; (7) multiple comparator employees were not subject to *any* form of discipline for the same event or similar violations; (8) contrary to OTK's position, Bedwell testified that Wilkie was not actually terminated because of Help Chain or failure to report violations; (9) OTK's progressive discipline policy steps were not followed; (10) Bedwell anticipated a lawsuit as a result of Wilkie's termination and Scheid and Stolz did not feel "good" about the termination decision at the time it was made; (11) Rodrigues told Wilkie he was on "borrowed time" when he requested an ADA accommodation; (12) Rodrigues and Scheid admit there are exceptions for applying first aid on the floor in medical emergencies; and (13) Rodrigues could not explain OTK created three different versions of termination paperwork containing different bases for the action, supplying Plaintiff and the EEOC with a version where the Walker incident and certain alleged policy violations were never mentioned."

(Doc. 41 at 39-40).

Wilkie's proffered pretextual reasons 1, 2, 3, 4, 5, 6, 8, and 12 can be grouped and addressed together as they all pertain to the application of OTK's safety protocol. As previously explained, Wilkie does not establish discrimination by showing that the SOP was not applied as written or that OTK's interpretation was flawed. OTK's application of the SOP is only relevant <u>if</u> there is evidence that it had previously applied the SOP inconsistently and not disciplined or counseled for similar conduct. There is no evidence of such. In fact, OTK presented evidence that in a similar incident involving Shift Coordinator Charles Parker, Parker was terminated. And although there is no evidence of Parker having any prior violation of the SOP, Parker's employment was terminated after a member of his team was injured and Parker gave the employee eye drops and failed to report the incident.

Wilkie's pretextual reasons 7 and 9 both pertain to OTK's discipline policies. Wilkie's reason 7 makes the assumption that anyone in the chain of command was subject to report the Woods incident, but as discussed above, these individuals are not adequate comparators. Reason 9 tries to assert that since Wilkie's superiors did not file a formal discipline action against him after the Walker event, and instead counseled him in private, the prior incident should not be used against him. As previously explained, this argument is unpersuasive since whether Wilkie was subject to discipline after his first infraction, the infraction still occurred.

Reason 10, regarding anticipating a lawsuit, fails to show anything relevant to the issue. And Wilkie's attempt to use out of context Rodrigues' alleged statement that Wilkie was "on borrowed time" is also insufficient to support pretext. (Doc. 32-2 at 17 (Plf. Dep. at p. 86)).

Reason 13 pertains to the preparation of Wilkie's termination paperwork. Wilkie asserts that there were three versions which are inconsistent. A review of the three versions proves otherwise: all three versions indicate that Wilkie is being terminated because he failed to follow the SOP <u>and</u> failed to follow prior instruction not to provide First Aid. (See Doc. 42-6 (Rodrigues Dep. at p. 243-46)). Therefore, the reasons Wilkie supplied for pretext do not create an issue of genuine fact to survive summary judgment.

## B.  <u>Count II – Interference in Violation of the FMLA</u>

The Family and Medical Leave Act was passed in order for employees to take extended leave to care for their families or for their own medical reasons. 29 U.S.C. § 2601(b). The FMLA prohibits employers from interfering with an employee's request to take leave under the FMLA. 29 U.S.C. §2615(a)(1). An employee can establish a prima facie case of FMLA interference by proving by a preponderance of evidence that they are entitled to the benefit that they were denied. <u>Strickland v. Water Works & Sewer Bd. of City of Birmingham</u>, 239 F.3d

1199,1207 (11th Cir. 2001) (citations omitted). Even though an employee in a FMLA interference action does not have to show any facts related to the employer's motives regarding the adverse action, when the employee is terminated, the employer can defend an interference claim by providing evidence that the employee would have been terminated anyway. Lapham v. Walgreen Co., 88 F.4th 879, 896 (11th Cir. 2023), cert. denied, No. 23-1283, 2024 WL 4426640 (U.S. Oct. 7, 2024) (citations omitted). The adverse action here is Wilkie's termination. As explained supra, OTK has provided an unrelated and unrebutted reason for this adverse action. Accordingly, this claim fails to survive summary judgment.

## C. Count III – Discrimination/ Retaliation in Violation of the FMLA

Wilkie claims that he was retaliated against based on his FMLA request. To establish a prima facie case of retaliation in a FMLA case, the plaintiff must prove (1) engagement in a statutorily protected activity, (2) an occurrence of an adverse act, and (3) a causal connection existing between the protected activity and the adverse act. Smith v. BellSouth Telecommunications, Inc., 273 F.3d 1303, 1314 (11th Cir. 2001). In other words, a plaintiff bringing a retaliation claim faces the burden of showing that his employer's actions "were motivated by an impermissible retaliatory or discriminatory animus." Strickland, 239 F.3d at 1207 (citations omitted). A claim of retaliation under the FMLA uses the McDonnell Douglas burden-shifting framework like the above ADA discrimination claim. Smith, 273 F.3d at 1314. The McDonnell Douglas framework requires Wilkie to make a prima facie case for discrimination, then the burden shifts to the defendant to show an unrelated, valid reason for the adverse action, and then the burden shifts back to Wilkie to show that the reason is pretextual. Id. (citations omitted).

### 1. Statutorily Protected Activity

The Court agrees with Wilkie's argument and authority that he engaged in a statutorily protected conduct when he discussed his future need for FMLA leave with Rodrigues.

### 2. Causal Connection Between the Protected Activity and Adverse Action

In order to establish a nexus between the protected activity and adverse action, a plaintiff can show that the two events were "not wholly unrelated," and that the decision maker was aware of the protected activity at the time of the adverse action. Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1234 (11th Cir. 2010) (citing Smith, 273 F.3d at 1314). There is no dispute that Rodrigues was aware of Wilkie's request for future FMLA leave. The Court also finds that the decision to terminate Wilkie and his request for future FMLA leave were temporally close in time. However, any potential causal connection is rebutted by OTK's valid reason for termination. And as previously explained, Wilkie has failed to present sufficient evidence for a reasonable jury to find that OTK's reason for termination was pretextual.

### IV. Conclusion

Accordingly, it is ORDERED that OTK's motion for summary judgment, (Doc. 34), is **GRANTED**.

Judgment shall be entered by separate document as required by Fed. R. Civ. P. 58(a).

**DONE** and **ORDERED** this the 19th day of November 2024.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**